# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PANAMA CITY DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                            **Case No. 5:15cr11-MW**

KACY ALLEN VAN PATTEN,

        Defendant.

_____/

## ORDER CONFIRMING RULING ON MOTION TO SUPPRESS

This is a criminal case. A federal grand jury's indictment charges that Defendant Kacy Allen Van Patten committed two crimes: (1) possession of methamphetamine with intent to distribute; and (2) possession of a firearm and ammunition after being convicted of felony. ECF No. 14. Defendant asserted that a search of a car violated his Fourth Amendment rights and moved to suppress all evidence arising from that search. ECF No. 22. On August 31, 2015, this Court held a hearing on the motion to suppress. At the conclusion of the hearing, this Court denied the motion.[1] This Court later entered a written

---

[1] Trial of this case was set for September 1, 2015. ECF No. 20. Defendant filed the motion to suppress on August 15, 2015. ECF No. 22. The government responded on August 26, 2015. This Court set the hearing for August 31, 2015. This Court would ordinarily hold a hearing on a motion to suppress some time before the eve of trial. The hearing date was

order briefly stating the ruling.  ECF No. 32.  This order more fully confirms

and supplements the ruling on the record denying the motion to suppress.

I

This Court makes the following findings of fact.  Investigator Stephen

O'Brien has worked for the Bay County Sheriff's Office for 5 years.[2]  He is

assigned to the Special Investigations Division ("SID"), which primarily

investigates narcotics.[3]  He has investigated narcotics since 2011.[4]

On December 3, 2014, Investigator O'Brien and three other SID

investigators—Brian Whittaker, Jason Procter, and Ray Scott—were

conducting surveillance of one Richard Barner at the Aqua View Motel in

Panama City Beach, Florida.[5]  The BCSO received information that Barner and

one Megan Scelfo were selling drugs out of Room 103 at the motel.[6]  The

investigators communicated using Nextel two-way phones.[7]

Before going to the motel, Investigator O'Brien had been watching

Barner's house.[8]  Barner's home was about a mile and a half to two miles from

unavoidable given the reassignment of this case and many others within the Panama City Division.  Accordingly, this Court made extensive inquiries on the record to ensure that neither party was prejudiced by the schedule of events.

[2]  Transcript of August 31, 2015, hearing ("Trans.") at 26.
[3]  *Id*. at 26, 32.
[4]  *Id*. at 26.
[5]  *Id*. at 26, 32, 80–81, 94.
[6]  *Id*. at 27.
[7]  *Id*. at 38.
[8]  *Id*. at 30–31.

the motel. Investigator O'Brien also knew of one Michael Brown and that Brown drove a silver BMW.[9] Brown lived at the same home as Barner. Investigator O'Brien had seen a silver BMW at that residence.[10]

At about 11:00 p.m., Defendant borrowed the BMW from Brown, a personal acquaintance. Defendant borrowed the BMW from Brown at Brown and Barner's residence.[11]

Investigator O'Brien saw Barner and Scelfo come and go from the motel room several times.[12] From about 8:00 p.m, Investigator O'Brien saw several dozen individuals park near the motel (though not in front of the room), walk up, knock on the door, enter, stay inside for several minutes, and then leave. Based on his training and experience, Investigator O'Brien thought this pattern of activity was consistent with drug activity, specifically a "short stay" where people arrive to deliver, pick up, or buy narcotics.[13]

Just before midnight, Barner left on a motorcycle and committed a traffic violation.[14] Investigators Whittaker and Procter arrested Barner and

---

[9] *Id*. at 31.
[10] *Id*. at 31, 35.
[11] Defendant Exhibit 1; Trans. at 19–22.
[12] *Id*. at 26–27.
[13] *Id*. at 27.
[14] *Id*. at 28.

found about half an ounce of methamphetamine in his pants.[15]  This amount of methamphetamine is consistent with selling rather than personal use.[16]

Because they had not seen Scelfo leave, Investigator O'Brien and two other officers entered the motel room to make sure she did not destroy evidence while they sought a search warrant.[17]  Scelfo was not there.  The investigators saw that the room had a back door.[18]  The officers locked both doors and kept watch.[19]  Investigator O'Brien then left to apply for a search warrant for the hotel room and Barner's home.[20]

Investigator Scott was on the west side of the motel.[21]  Investigator Whittaker was at the rear east side of a gas station across the street and facing the front of the motel.[22]  Investigator Procter was about 100 feet away on the east side of Bristol Street with a view of the rear of the motel and the back door to the motel room.[23]  This image shows their rough positions[24]:

---

[15] *Id*. at 28.
[16] *Id*. at 29.
[17] *Id*. at 29–30.
[18] *Id*. at 30.
[19] *Id*. at 30.
[20] *Id*. at 30, 35.
[21] *Id*. at 33.
[22] *Id*. at 33.
[23] *Id*. at 33.
[24]  The testimony gave the positions of Investigator Scott and Investigator Whittaker with less specificity than the position of Investigator Procter.  Their positions on this map are shown to give a general frame a reference.  Of course it does not establish their respective positions with specificity.  The image is from Google Maps using the address of the Aqua View Motel, 4909 Hispaniola Street, Panama City Beach, Florida.  *See* Defendant Exhibit 3.



Government Exhibit 3 below shows the parking lot across the street from the

motel where Investigator Procter was parked.[25]



This Court takes judicial notice of the geography. *See, e.g.*, *United States v. Proch*, 637 F.3d 1262, 1266 n.1 (11th Cir. 2011).
    [25] This image has been cropped from the bottom and reduced in size.

Investigator Procter was parked about where the black car is parked in the image. Government Exhibit 4 shows about the view that Investigator Procter had, though his view was slightly more from the left.[26] It was dark outside but the motel had ambient lighting. There was a multistory building nearby with lights shining into the parking lot.[27] Room 103 was three doors in.[28]



---

[26] *Id*. at 50–51.
[27] *Id*. at 50–51, 53, 84.
[28] *Id*. at 51.

Shortly after midnight, a BMW came to the motel. At first, Investigator Whittaker saw the BMW drive towards the front-door side of the motel room. The BMW hesitated for a moment. Then it drove around to the back-door side of the motel room.[29] Investigator Procter saw the BMW pull into the parking lot shown in Government Exhibit 4. He alerted the other investigators that there was a car in the parking lot.[30] The BMW pulled behind the structure next to the coke machine.[31] Government Exhibit 6 shows where the BMW was parked from the perspective of Room 103. The BMW was parked where the blue car is in the image[32]:

---

[29] *Id*. at 72–73.
[30] Trans. at 46.
[31] *Id*. at 44.
[32] *Id*. at 45.



A tall, white male wearing black clothing, including a hooded sweatshirt and black gloves, got out, walked towards the motel room and knocked on the door.[33]  Investigator Procter alerted Investigator Whittaker.[34]  Investigator Whittaker went from his spot in front of the motel around to the back of the motel.[35]  By the time the suspect began knocking, Procter and Whittaker began approaching Room 103.[36]

---

[33]  *Id*. at 46.
[34]  *Id*. at 46.
[35]  *Id*. at 73.
[36]  *Id*. at 46.

Investigator Procter was wearing a black BCSO t-shirt with his badge on a chain around his neck and jeans.[37]  Investigator Whittaker was wearing plain clothes.[38]

The investigators approached (Procter from across the street, Whittaker from around the corner on the right side of Government Exhibit 5[39]). Investigator Whittaker rounded the corner, saw Defendant, and said "Sheriff's Office."[40]  Defendant turned, looked at Investigator Whittaker, and ran away.[41] Defendant started to flee in the opposite direction of the BMW.[42]  The investigators gave chase and repeatedly yelled "Sheriff's office, stop!"[43] Defendant ran towards the grills as shown in Government Exhibit 7, which shows the view from Room 103 from the right of Government Exhibit 6:

---

[37] *Id*. at 51, 68.
[38] *Id*. at 52.
[39] *Id*. at 54.
[40] *Id*. at 74.
[41] *Id.* at 74.
[42] *Id*. at 75.
[43] *Id*. at 68, 75.

 

As Defendant attempted to climb the fence at its corner, shown in Government Exhibit 7, Investigator Whittaker grabbed him and took him to the ground.[44] Defendant stood up. Investigator Procter grabbed Defendant from the front. He saw that Defendant had a knife in his belt and was reaching into his right front pocket.[45] After a brief struggle, the investigators handcuffed Defendant and eventually placed him in a patrol car.[46] The investigators found a gun in Defendant's right front jacket pocket.[47] They found a bag of

---

[44] *Id*. at 76.
[45] *Id*. at 48.
[46] *Id*. at 57.
[47] *Id.* at 65.

marijuana in his back pocket. Defendant was wearing black rubber gloves similar to what law-enforcement officers wear when handling evidence.[48] Government Exhibits 8 and 9 show Defendant's clothing and his gloves.

 

After Defendant's arrest, Sergeant Jamie Young of the BCSO arrived.[49] Sergeant Young and Investigator Procter went over to the BMW, which still had its engine running.[50] Another person, Dannielle Berney, had been a

---

[48] *Id.* at 77.
[49] Sergeant Young was close by waiting for the search warrants. *Id.* at 103. He came to the motel when he heard Investigator Procter radio that the BMW was pulling into the motel parking lot. *Id.* at 104.
[50] *Id.* at 55. Investigator Whittaker stayed with Defendant. *Id.* at 88.

passenger.  Berney was standing at the rear of the BMW when Sergeant Young

approached and spoke to her.[51]  Sergeant Young asked Berney for

identification and learned that she was 17-years old.[52]  Sergeant Young ran a

check on Berney and learned that a juvenile arrest warrant or "pickup" order

existed.[53]  Sergeant Young told Berney about the pickup order and read her

*Miranda* warnings.[54]

After reading *Miranda* warnings, Sergeant Young asked Berney about

the BMW.[55]  Another investigator ran the BMW's license plate number and

learned it belonged to Brown.[56]  While Investigator O'Brien was preparing the

search warrant applications, the officers at the motel radioed the name

"Michael Brown."[57]  Investigator O'Brien radioed back that Michael Brown

lived at Barner's house.[58]

Berney told Sergeant Young that Brown was her brother, that she had

taken the BMW from Brown, and "they" came together.[59]  Berney would not

say who was driving.  Berney would not provide any more information about

---

[51] *Id*. at 96.
[52] *Id*. at 96.
[53] *Id*. at 107.
[54] *Id*. at 107.
[55] *Id*. at 97.
[56] *Id*. at 97.
[57] *Id*. at 38–39.
[58] *Id*. at 38–39, 101.
[59] *Id*. at 97, 107.

how to reach Brown, explaining that Brown did not know that she took the car.[60]  Sergeant Young put her in a police car.[61]  The investigators did not ask Defendant how to contact the owner of the BMW.[62]

The BCSO has a policy for the impoundment of motor vehicles.[63]  It provides that a BCSO officer must have a vehicle towed if, among other reasons, the officer has probable cause to believe the vehicle was used as the means of committing a crime or that the vehicle is itself evidence which tends to show that a crime has been committed.[64]  The policy also provides for towing abandoned vehicles.[65]  It states that "[i]f reasonable efforts to contact the owner have been unsuccessful or the owner or person in control of the vehicle has failed to effect immediate removal," the BCSO officer must contact a tow truck, perform an inventory of the contents of the vehicle, and complete an incident report and a vehicle inventory record."[66]  The policy also provides standard procedures for the inventory of personal property found in an impounded vehicle.[67]

---

[60]  *Id*. at 97.
[61]  *Id*. at 97.
[62]  *Id*. at 63.
[63]  ECF No. 27-2.
[64]  ECF No. 27-2, at 4.
[65]  ECF No. 27-2, at 1, 5.
[66]  ECF No. 27-2, at 1–2.
[67]  ECF No. 27-2, at 2–3.

About 15 to 20 minutes after he arrived, Sergeant Young decided to impound the BMW.[68]  Investigator Procter completed the top portion of the BCSO inventory record, showing the case number, date, and vehicle information, which is Government Exhibit 1.[69]  Sergeant Young called Berney's mother and learned that Brown is not Berney's brother.[70]  Sergeant Young directed Investigators Whittaker and Procter to perform an inventory search of the BMW.[71]

Only Investigator Whittaker searched the BMW, because Investigator Procter left to transport Berney.[72]  Sergeant Young did not give Investigator Whittaker a reason for the search.[73]  Among other things, Investigator Whittaker found a purple bag Crown Royal bag on the passenger side floorboard.[74]  Inside the bag, the investigators found $5,800 in cash and 5 clear, plastic bags containing a total of 138.2 grams of methamphetamine.[75]

---

[68]  Trans. at 106.
[69]  Trans. at 61.
[70]  The BCSO took Berney into custody and transferred her to the Florida Department of Juvenile Justice.
[71]  *Id*. at 69, 89, 108.
[72]  *Id*. at 100.
[73]  *Id*. at 89.
[74]  Defendant Exhibit 2.
[75]  Defendant Exhibit 2, Trans. at 102.

Investigator Whittaker completed some of the inventory record after the search.[76] The line on the inventory record documenting attempts to notify the owner is blank:



Government Exhibit 1. Investigator Whittaker got Brown's address from Investigator O'Brien after the inventory while filling out the paperwork.[77]

Having set out findings of fact, this Court turns to whether the search of the BMW violated Defendant's Fourth Amendment rights.

## II

The first issue is whether Defendant has standing to contest the search of the BMW. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. A person shows a Fourth Amendment violation by establishing an invasion of his reasonable expectation of privacy. *United States v. Bachner*, 706 F.2d 1121, 1125 (11th Cir. 1983) (citing *Katz v. United States*, 389 U.S. 347 (1967)). In short, "[o]nly those persons whose privacy is invaded by a search have standing to object to it under the

---

[76] *Id.* at 61.
[77] *Id.* at 79.

exclusionary rule." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973).[78]

It is well-established that a person may have a reasonable expectation of privacy in a borrowed car. *See*, *e.g.*, *United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987). This Court credits Defendant's testimony in light of the other evidence and finds that he had borrowed the BMW from Brown and was using the BMW with Brown's permission.

"[I]t is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned." *Colbert*, 474 F.2d at 176. "[A]n individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police." *United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001). The government has the burden of proving abandonment. *Id*. at 1306.

"Whether abandonment has occurred is a question of intent that may be inferred from acts, words and 'other objective facts.' " *Id*. (quoting *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982)). "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise

---

[78] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Williams*, 569 F.2d 823, 826 (5th Cir. 1978) (quoting *Colbert*, 474 F.2d at 176). "All relevant circumstances existing at the time of the alleged abandonment should be considered." *Colbert*, 474 F.2d at 176.

This Court finds that Defendant abandoned the BMW. The reasons are quite similar to *United States v. Falsey*, 566 F. App'x 864 (11th Cir. 2014). In *Falsey*, the court described several circuit precedents where the drivers of cars fleeing on foot from police were found to have abandoned them. *Id*. at 867. When a driver of a car sitting in a parking lot with its engine running flees from police, "[h]is only conceivable purpose" is to "rid himself of the vehicle with its incriminating contents." *Id*. (quoting *Williams*, 569 F.2d at 826). The *Falsey* court said "[t]he driver 'was just like the bank robber who having a gun, finds himself pursued, and in his hope of escaping detection throws the gun into a yard where, if it is not picked up he might retrieve it' later." *Id*. (quoting *Williams*, 569 F.2d at 826). The court said "[s]uch conduct is transparently an abandonment of the tight grip of ownership and reliance solely on the feeble hope of re-acquisition." *Id*. (quoting *Williams*, 569 F.2d at 826). It makes no difference that Defendant's intent when getting out of the BMW was, perhaps, to deliver drugs to the motel room. His intent when fleeing from the BCSO

investigators while the car was still running was to distance himself from the drugs in the BMW.

The fact that Defendant was caught by the BCSO before escaping the parking lot is not determinative. Abandonment is a question of intent. It matters not that Defendant did not succeed in escaping. *See Colbert*, 474 F.2d at 177) (finding abandonment where defendants "began to walk away" from property). Likewise, the fact that Berney was in the car is not determinative. For example, in *Falsey* the court explained the fact that defendant's "father later tried to retrieve the car" did not change the analysis or result. *Id*. at 867. Perhaps Defendant hoped that his 17-year old passenger would take the car to him later, or that he could retrieve it after eluding law enforcement. But Defendant's actions are still abandonment as a matter of law. *Id*.

Here Defendant's intent to abandon the BMW is evident from all the circumstances. Defendant was fleeing from two BCSO investigators that had yelled "Sheriff's office, stop!" He was attempting to climb the fence of the parking lot. He left the car open and running.

This Court finds that while Defendant received permission to have the BMW, and on that threshold question would have standing, he does not have standing because he abandoned the BMW. So he cannot challenge the constitutionality of the search.

III

Assuming that Defendant had *not* abandoned the BMW, and so had standing to challenge the search, the second issue is whether the search of the BMW was reasonable under the automobile exception to the warrant requirement.

Under the automobile exception, a warrantless search of a vehicle is permitted if (1) the vehicle is readily mobile (that is, operational); and (2) officers have probable cause to believe the vehicle contains contraband or evidence of a crime. *See, e.g.*, *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). Defendant does not argue that the BMW was immobile.[79] So the issue is probable cause.

Probable cause "exists when under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found" in the vehicle.' " *Tamari*, 454 F.3d at 1264 (quoting *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002). The police need not exclude other possibilities. *See United States v. Moreno*, 588 F.2d 490, 494 (5th Cir. 1979). And probable cause does not require absolute certainty. *See United States v. McGregor*, 31 F.3d 1067, 1073 (11th Cir. 1994).

---

[79] ECF No. 22, at 3; Trans. at 134.

Facts supporting probable cause may come from police officers'
personal knowledge. *See*, *e.g.*, *Pennsylvania v. Labron*, 518 U.S. 938, 940
(1996). They may also come from the "collective knowledge of the law
enforcement officials." *United States v. Blasco*, 702 F.2d 1315, 1324 (11th
Cir.1983). The information from an independent source that can be
independently corroborated may also form the basis for probable cause.
*United States v. Joseph*, 709 F.3d 1082, 1099 (11th Cir. 2013). Law
enforcement officers may also use their experience, training, and expertise to
draw limited inferences of criminal activity that is not facially criminal. *See*,
*e.g.*, *United States v. Jenkins*, 901 F.2d 1075, 1080–81 (11th Cir. 1990).

This Court finds that the BCSO had probable cause to search the BMW.
The BCSO had information that Barner and Scelfo were selling drugs from
Room 103. That information was corroborated by the BCSO's surveillance of
Room 103, which was consistent with drug trafficking. And it was confirmed
with the arrest of Barner, who possessed a quantity of methamphetamine
consistent with trafficking.

Defendant arrived at the motel room under suspicious circumstances.
First he drove to the front of the motel, then pulled around to the back. He was
dressed in black and wearing black rubber gloves. He knocked on the door of
Room 103, where suspected drug sales had occurred, and fled from the BCSO

investigators when they announced themselves as law enforcement officers.

Defendant was armed with a gun and a knife. He had marijuana—not

methamphetamine—in his pockets. Most importantly, the BCSO connected

the BMW with their drug investigation of Barner and Room 103.

Based on the totality of circumstances, a fair probability existed that the

BMW was part of the drug-trafficking operation. It is reasonable to infer that

it was being used—or had been used—to deliver methamphetamine from

Barner's home to the motel room where the suspected drug sales were taking

place. The BCSO had probable cause to believe that the BMW contained

contraband or evidence of a crime—for example, drugs, traces of drugs,

money, or weapons.

The fact that the BCSO officers documented the search as an inventory

does not change this conclusion. *See, e.g.*, *United States v. Lanzon*, 639 F.3d

1293, 1300 (11th Cir. 2011). This is so because "[a] police officer's subjective

reasons for a search do not control the legal justification for his actions, as long

as objective circumstances justify the search." *Id*.

This Court concludes that the search of the BMW was reasonable under

the automobile exception to the warrant requirement of the Fourth

Amendment.

IV

Assuming that Defendant has standing to contest the search and that there was not probable cause to search the BMW, the third issue is whether the evidence was discovered during a valid inventory search.

The Fourth Amendment allows for warrantless inventory searches of automobiles. *S. Dakota v. Opperman*, 428 U.S. 364, 375–76 (1976). The government has the burden of showing that the requirements of the inventory-search exception have been met. *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir.1992). The basic rule is this:

> Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity. If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria.

*Id*. at 1543 (quotation omitted).

The validity of an inventory search turns on the legality of the decision to impound the car. *Id*. at 1543. "[A] police officer's decision to impound a car may involve discretion but must be made according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. *United States v. Handy*, 592 F. App'x 893, 907 (11th Cir. 2015) (citing *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)). "[T]he critical question . . . is

not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason." *Id*. (quoting *Sammons*, 967 F.2d at 1543, and omitting internal quotation).

This Court finds that Sergeant Young's decision to impound the BMW was based on established procedures and reasonable under the Fourth Amendment. The BCSO policy provides two equally valid bases for impounding the BMW. The BCSO investigators had probable cause to believe the BMW was used as the means of committing a crime; that is, drug trafficking. Under the policy, impoundment was mandatory. Second, although not a model of clarity, the BCSO policy authorizes impoundment of abandoned vehicles if reasonable efforts to contact the owner are unsuccessful or if the "person in control of the vehicle has failed to effect immediate removal."

Here, the BCSO officers identified the owner of the car, Michael Brown. Berney, a 17-year old, said he was her brother and she took the car without his knowledge. Berney would not say how to reach Brown. The BCSO did not ask Defendant how to reach Brown. If that were it, this Court may not have found that to be "reasonable efforts" to contact the owner.

But this Court finds that Sergeant Young learned that Brown was connected to Barner and the drug investigation as the decision to impound the car was made and before the actual search of the car was performed.[80] "Reasonable efforts" does not mean law enforcement must call the very location they mean to search and warn those present that the resident's car containing drugs has just been seized. Among other concerns, such a requirement may implicate officer safety in executing a search warrant or risk the destruction of evidence. It is plainly reasonable to stop trying to notify the owner of the car—not because police want to search the car—but because the police do not want to compromise their investigation elsewhere.

This Court noted above that the search was valid under the automobile exception despite the fact that Investigator Whittaker was told to perform an inventory search. This was so because of the objective existence of probable cause. Something of the reverse is true: "If an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found." *United States v. Prescott*, 599 F.2d 103, 106 (5th Cir. 1979).

---

[80] This Court recognizes that Sergeant Young testified on direct examination that he could not remember exactly when Investigator O'Brien told the officers at the motel that Brown lived at Barner's home. Trans. at 101. Any ambiguity about the chronology was resolved on cross examination when Sergeant Young testified that he spoke to Investigator O'Brien before he instructed to the other investigators to inventory the BMW and call a tow truck. *Id*. at 108.

This Court therefore finds that the decision to impound the car was based on established criteria and something more than suspicion of evidence of criminal activity.

Defendant argues that the inventory search was unreasonable because the BCSO investigators did not document efforts to notify the owner of the BMW. Indeed the line on the inventory record for owner notification is blank. *See* ECF No. 27-1. Sergeant Young later completed a supplemental report describing the relevant circumstances. *See* Government Exhibit 13.

"Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function." *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998). "This does not mean that inventory searches are always unreasonable when standard procedures are not followed." *Id*.

Here, the BCSO officers did not initially "attempt" to contact Brown because Berney would not tell them how to reach him. Once they learned that Brown lived with Barner, it would have been unwise to alert Brown that the BCSO had the BMW. So, under the policy, there was nothing to complete on that part of the form.

This Court concludes that the inventory search of the BMW complied with the established inventory search guidelines of the Bay County Sheriff's Office and was reasonable under the Fourth Amendment.

For these reasons,

**IT IS ORDERED**:

Defendant's motion to suppress, ECF No. 22, is **DENIED.**

**SO ORDERED on November 9, 2015.**

**s/Mark E. Walker___**
**United States District Judge**
